## CONTINUATION OF SEARCH WARRANT

I, Alex Travers, being duly sworn, do hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a cell phone (the **"Target Device"**), which is currently in law enforcement possession in the Western District of Michigan, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2022. I am currently assigned to the Detroit Division, Marquette Resident Agency. Prior to my employment with the FBI, I was a police officer for over eight (8) years in Cranston, Rhode Island where I served as a patrol officer, as a member of the department's Special Reaction Team, in temporary assignments with the department's Special Investigations Unit, and as a patrol sergeant.

3. As an FBI agent, I have investigated and assisted in the investigation of various types of federal criminal violations, including offenses involving interstate communications, stalking, and domestic assault by an habitual offender. As a police officer, I received training and have experience in investigating domestic violence and breaking and entering.

4. My duties include the investigations of various violations of federal criminal law, including matters involving violations of 18 U.S.C § 117, domestic assault by an habitual offender, 18 U.S.C §§ 13, 1151, 1152, Michigan Compiled Laws

§§ 750.110a(4)(a), (7), 750.411h(1)(e), (2)(a), home invasion – third degree, 18 U.S.C. § 875(c), interstate communication of a threat, and 18 U.S.C. §§ 2261A(1)(A)(i), (2)(B), 2261(b)(5), stalking (the "**Target Offenses**").

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents, other law enforcement officers, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. I submit that this continuation shows there is probable cause to believe that evidence, as further described in Attachment B will be found during a search of the **Target Device**, as further described in Attachment A.

**PROBABLE CAUSE**

**I. Indian Country**

7. On July 31, 2026, Keweenaw Bay Tribal Police notified the FBI of a complaint in which the subject, Steven Michael Fortin, was threatening the victim (Victim). Tribal police advised that Fortin was believed to be in Minnesota and identified his phone number as 906-362-2435. I obtained records from the Keweenaw Bay Indian Community which showed that Victim is an enrolled member of the Keweenaw Bay Indian Community, a federally recognized tribe. The U.S. Attorney's Office informs me that based on her enrolled status, Victim is an Indian as defined by federal law. I obtained records from the Bureau of Indian Affairs which showed that Victim's residence (the Residence) is vested in the federal government and held

in trust for the Keweenaw Bay Indian Community. The U.S. Attorney's Office informs me that makes the property Indian Country for purposes of federal law.

**II. Domestic Assault by an Habitual Offender**

8. On August 3, 2026, I interviewed Victim. Victim reported that she had been in an on-again/off-again, intimate relationship with Fortin since January 2026. Fortin recently relocated to the area of Nashwauk, Minnesota for work, which she believed was a natural break in their relationship.

9. Victim described an incident from May 2026 in which she locked herself in the bathroom at the Residence during an argument with Fortin. Fortin attempted to enter the bathroom by using a butter knife to open the door. When Victim believed that Fortin had left the area of the door, she tried to run outside; however, Fortin grabbed her. Victim tried to fight Fortin off but was unable to. Victim called a third-party who contacted police. Victim did not report the physical altercation to police because she was aware of Fortin's prior domestic violence history and just wanted him dispersed.

10. Victim had a photograph from June 1, 2026, of bruising on her inner arm from Fortin grabbing her during this incident:







11. Victim provided a cell phone recording from the incident in which she was behind a closed door, believed to be her bathroom, with her foot pressed against it and was arguing with Fortin who was not in the same room as her. At one point in the video, Victim exited the bathroom she was in and appeared to start walking. Towards the end of the video, it appeared as if someone was quickly walking down a set of stairs. Fortin can then be heard saying something similar to "No" and Victim said, "Don't fuck…" at which point the recording ended.

12. Victim provided a separate recording from the incident. The camera was initially pointed at the ceiling, and it started with Fortin saying, "…fighting." Fortin said that he would leave in the morning and Victim pleaded with Fortin to get off of her.

13. I reviewed a Chocolay Township Police record related to this incident which showed that police responded to Victim's home on May 29, 2026. Victim reported to police that nothing physical occurred and she did not want Fortin at her house anymore. Fortin reported to police that he had been staying at the Residence for about three (3) months. Police subsequently transported Fortin to a friend's house.

14. Victim reported being aware that Fortin had a history of domestic violence toward others, which heightened her fear as it relates to the threats and harassing conduct on July 30 and 31, 2026.

15. Fortin has two (2) prior domestic violence convictions. I obtained a certified copy of the Register of Actions in Case 2011-M111594SM-SM in 96th District Court in Marquette County which showed that Fortin was convicted on April 13, 2012, of domestic violence. I reviewed the associated police report from the conviction, and the victim in the case was in a dating relationship with Fortin at the time of the incident.

16. I obtained a certified copy of the Judgment of Sentence in Case 2023-231122SM-SM in 96th District Court in Marquette County in which Fortin was convicted on July 23, 2024, of domestic violence second offense. I reviewed the associated police report from the second conviction, and the victim in the case was in a dating relationship with Fortin at the time of the incident.

## III. Home Invasion

17. Victim described an additional incident from June 2026. Victim was sleeping in bed with her children after an argument with Fortin. She blocked Fortin

and turned off her phone. She was awoken to Fortin standing over her while she lay in bed with her children at the Residence. Fortin had not been invited to the Residence and Victim had previously set boundaries with Fortin where he was to not go to the Residence without informing her. Victim was able to push Fortin out of the Residence.

18. After leaving the Residence, Victim received a voicemail from Fortin on June 4, 2026, at 12:07 a.m. in which Fortin seemingly called someone to discuss the incident at the Residence, but his phone was on the line with Victim, and he left the following voicemail:




19. In the voicemail, Fortin described getting drunk, calling victim, being blocked by her, and driving to the Residence. Fortin explained that he walked inside and that he had been living there for the past couple months. Fortin further explained that he walked inside, woke Victim up, he should not have done that, and now it was "all bad."

## IV. Interstate Communication of a Threat and Stalking

20. She reported that during the evening of July 30, 2026, into July 31, 2026, while at home, she received threatening Snapchat messages from Fortin, while she was in the Western District of Michigan, and identified his Snapchat username as "stevenohh024" and her username as "tammyj0818". Fortin seemingly believed that Victim was with another male, and Victim screenshotted the messages from Fortin, which geolocated him to Lone Pine, Minnesota and Swan Lake. Based on a Google Maps search, those locations are in Minnesota. Among other things, Fortin told Victim, "I'm omw[1] back and I'm going to kill him and you."[2]

---

[1] Based on my training and experience, "omw" means "on my way."

[2] The U.S. Attorney's Office informs me that to qualify as a threat under 18 U.S.C. § 875(c) it must be a "true threat." The U.S. Attorney's Office informs that the Sixth Circuit's pattern jury instructions define a "true threat" "as a statement that is a serious expression of intent to inflict bodily harm on a particular person or a particular group that a reasonable observer would perceive to be an authentic threat."


10:54
Steven
Lone Pine, MN · now
Don't miss Chats from Steven! Enable notifications
Dude blocked me I caught you
Hahahah
You lie
You will always lie
To get what you want
STEVEN DELETED A CHAT
Steven
Hope you get herpes you fucking slut
3 Missed Calls
4m ago
Call Back
I'm calling CPS on youmuat netaling to him huh
I'm find out who it is
Don't worry
Your car is gonna be fucked and so is he
Missed Call
1m ago
Call Back
I'm omw back and I'm going to kill him and you
Good luck
You made me like this
Send a chat


12:30
Steven
Swan Lake · 2m
Don't miss Chats from Steven! Enable notifications
I called someone to come get my shit rn and also the cops
So I'll know if he's there
Missed Call
4m ago
Voice Call
Video Call
I'll be there tm
You fucking cheating lieing ass slut
I'll come meet your new man and beat the fuck out of him screen shit it bby cause I'll be on the news for murder
Fucking slit
Slut
Wyd man
Wtf
Not wyd wyf
Why are you doing thisafter all this shit we planned and talked about you want other men or man
Wtf
I just lost my place to stay and my job
Send a chat


1:13
Steven
Swan Lake · 1m
Don't miss Chats from Steven! Enable notifications
feelings hurt even more
NEW
Steven
Lets see
The. I'll know who he is
It's fine I'll be there tm and the next day and the next
I'll find him don't you worry
4 Missed Calls
2m ago
Call Back
Nope
I'll wait and see
And I will dicking beat the fuck out of him
Don't you worry
I know everyone I will find him
I'll see
3 Missed Calls
11s ago
New Chats
Send a chat

21. Victim also provided a screenshot of her phone's call log from Thursday, July 30, 2026, and Friday, July 31, 2026. The screenshot shows that "Steven," who victim identified as Fortin's number, called her at least 25 times[3]:




[3] Following some of the calls, there is a parenthetical (e.g., "14"), which based on my training and experience reflects multiple missed calls from that number for a single entry.

22. On July 31, 2026, Victim went to her workplace in Marquette County, which is also within the Keweenaw Bay Indian Community reservation in Marquette County. She reported that at approximately 11:30 a.m., Fortin called her work about four (4) times as she recognized Fortin's phone number on the phone's caller identification. Victim asked her coworker to answer the phone and the caller hung up. Victim was later notified that Fortin called her workplace's manager and informed her manager that they needed to drug test Victim because she was selling heroin from the workplace.

23. During my interview with Victim, she became tearful and explained that she was scared. She described feeling uncomfortable thinking about Fortin showing up at the Residence because she had children in the home.

24. Victim called Fortin on Saturday, August 1, 2026, because she felt that she needed to know where he was. She felt afraid that Fortin was going to arrive at her home. During her phone call with Fortin, she learned that Fortin was still in Minnesota.

**V. Fortin's Arrest in the District of Minnesota and Indictment**

25. On August 5, 2026, I obtained a criminal complaint and arrest warrant for violations of 18 U.S.C § 875(c), interstate communication of a threat, 18 U.S.C § 2261A(2), cyberstalking, 18 U.S.C § 117, domestic assault by an habitual offender, and 18 U.S.C §§ 13, 1151, 1152, Michigan Compiled Laws § 750.115, entering without breaking (See *United States of America v. Steven Michael Fortin*, 2:26-mj-58, filed in the Northern Division of the Western District of Michigan). The FBI arrested Fortin

in Forbes, Minnesota on August 13, 2026, and seized a Motorola cell phone incident to arrest from his pants pocket:



26. On August 19, 2026, a federal grand jury in Marquette, Michigan returned an indictment which charged Fortin with the **Target Offenses**.

27. The **Target Device** was later transferred to the FBI Marquette Resident Agency in Marquette, Michigan, as evidence of the crimes charged. The **Target Device** is currently located at the FBI Marquette Resident Agency. The **Target Device** has been maintained in a manner so that the contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Device** first came into the possession of the FBI.

28. I believe that a search of the **Target Device** will provide investigators with additional evidence related to the **Target Offenses**.

## SPECIFICS OF SEIZING AND SEARCHING PHONE EVIDENCE

29. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30. I know based on my knowledge, training, and experience that:

i. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium or electronic device that is not currently being used by an active file—for long periods of time before they are overwritten both on smartphones and computers. In addition, a computer's or smartphone's operating system may also keep a record of deleted data in what is commonly referred to as a swap or recovery file;

ii. Phone files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. When a person "deletes" a file on a phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data;

iii. Wholly apart from user-generated files, phone storage media—in

particular, internal hard drives—contain electronic evidence of how a phone has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Phone users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information; and

iv. Files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or cache.

31. As further described in Attachment B, this application seeks permission to locate not only device files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how devices were used, the purpose of their use, who used them, and when. Probable cause exists that this forensic electronic evidence will be on the **Target Phone.**

32. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs,

and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the phone was in use. Phone file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

33. Information stored within a computer, phone, and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer, phone, or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer, phone, or storage media.

34. This user attribution evidence is analogous to the search for indicia of occupancy while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the phone was remotely accessed, thus inculpating or exculpating the phone owner. Further, computer, phone, and storage media activity can indicate how and when the

computer, phone, or storage media was accessed or used. For example, computers and phones typically contain information that logs user account session times and durations, computer and phone activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the device accessed networks and the internet. Such information allows investigators to understand the chronological context of device access, use, and events relating to the crime under investigation.

35. Some information stored within a computer, phone, or other electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or phone may both show a particular location and have geolocation information incorporated into its file data. Such file data also typically contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer or phone user.

36. Information stored within a computer or phone may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the device may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy

evidence on the device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

37. A person with appropriate familiarity with how a computer or phone works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

38. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer and phone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or phone is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

39. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40. I know that when an individual uses a computer or phone to threaten, intimidate, or harass someone, the individual's device will generally serve both as an

instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer or phone used to commit a crime of this type may contain data that is evidence of how the device was used, data that was sent or received, notes as to how the criminal conduct was achieved, and other records that indicate the nature of the offense.

41. Computer and phone users can attempt to conceal data within equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension .jpg often are image files. A user can easily change the extension to .txt to conceal the image and make it appear that the file contains text. Computer and phone users can also attempt to conceal data by using encryption. Encryption involves the use of a password or device, such as a dongle or keycard, to decrypt the data into readable form.

42. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging, or otherwise copying of the **Target Device** would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium. This might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described

by the warrant.

43. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

44. Based upon the information above, your affiant submits that there is probable cause to believe violations of the **Target Offenses** were committed and that the items described in Attachment B are evidence of these violations and that the items described in Attachment B are likely to be found within the property described in Attachment A. I request that the Court issue a warrant authorizing a search of the **Target Device** that is described in Attachment A for the items described in Attachment B.